Katsas, Circuit Judge, concurring in part and dissenting in part:
This case arises out of a reduction in force (RIF) conducted by the District of Columbia Child and Family Services Agency. The plaintiffs challenged the RIF as the source of an alleged disparate impact on black employees. On summary judgment, the district court held that the RIF itself-a series of layoffs-was not a particular employment practice subject to disparate-impact challenge under Title VII.
My colleagues remand for the district court to consider other challenges to more specific practices through which the RIF might have been implemented-decisions to eliminate certain job categories and to permit individual supervisors to use subjective criteria in making layoff decisions. Because the plaintiffs disavowed those challenges, and because the challenge that they made lacks merit, I would affirm the summary judgment in its entirety.
I
Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to limit, segregate, or classify" employees in any way that would "adversely affect" an individual's "status as an employee, because of ... race." 42 U.S.C. § 2000e-2(a)(2). In Griggs v. Duke Power Co. , 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court construed this provision to prohibit employment practices that, without business justification, produce adverse impacts correlated to race. The Court elaborated on the scope of disparate-impact liability under Title VII in Watson v. Fort Worth Bank & Trust , 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988), and Wards Cove Packing Co. v. Atonio , 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).
Congress responded to these decisions with the Civil Rights Act of 1991, which codified disparate-impact liability and specified its parameters. Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074-75. As a result, Title VII now provides that "[a]n unlawful employment practice based on disparate impact is established ... only if," as relevant here, the plaintiff "demonstrates" that the employer "uses a particular employment practice that causes a disparate impact on the basis of race." 42 U.S.C. § 2000e-2(k)(1)(A) & (A)(i). Moreover, when challenging multiple practices, the plaintiff "shall demonstrate that each particular challenged employment practice causes a disparate impact," unless the plaintiff "can demonstrate ... that the elements of [an employer's] decisionmaking process are not capable of separation for analysis." Id. § 2000e-2(k)(1)(B)(i).
The D.C. Child and Family Services Agency provides services to abused and neglected children. In 2009 and 2010, the City Council reduced the Agency's budget by $ 37.4 million and lowered its cap on *1258 employees from 940 to 840. As a result, the Agency undertook a RIF in which 115 employees lost their jobs. About 70 of these employees were Social Worker Associates (SWAs) or Social Service Assistants (SSAs). The others worked in various divisions throughout the Agency.
The plaintiffs are former employees terminated during the RIF. They contend that the RIF writ large produced an unlawful disparate impact on black employees, and they seek to represent a putative class of all employees terminated during the RIF, including a subclass of all terminated black employees. Between 2010 and 2015, the plaintiffs filed four different complaints, conducted discovery on the alleged disparate impact, and produced two expert reports addressing it. The plaintiffs' expert sought to measure the effect of the RIF as a whole, by comparing the racial composition of the terminated employees to that of the overall Agency workforce. See Expert Report of Dr. Paige Munro, Davis v. District of Columbia , No. 10-cv-1564 (D.D.C.), ECF Doc. 146-3, Ex. I at 1-4; Rebuttal Report of Dr. Paige Munro, ECF Doc. 146-4, Ex. K at 2-3.
After all of this, the District moved for summary judgment. As relevant here, it argued that the plaintiffs had neither identified a "particular employment practice" subject to disparate-impact scrutiny nor produced evidence of any statistical disparity caused by such a practice. See Def.'s Mem. Supp. Mot. Summ. J., ECF Doc. 146 at 18-23. In response, the plaintiffs argued that "the RIF" was the challenged "particular employment practice," which produced a disparate impact because the Agency terminated 15.5% of its black employees but only 5.6% of its other employees. See Pls.' Mem. Opp'n Def.'s Mot. Summ. J., ECF Doc. 148 at 37-41.
The district court granted summary judgment for the District. It ruled that the plaintiffs had failed to establish a prima facie case because "the RIF" was not a "particular employment practice" subject to challenge under Title VII's disparate-impact provisions. Davis v. District of Columbia , 246 F. Supp. 3d 367, 393-97 (D.D.C. 2017).
II
The Supreme Court has made clear that, for disparate-impact claims, "the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force." Wards Cove , 490 U.S. at 656, 109 S.Ct. 2115 (quoting Watson , 487 U.S. at 994, 108 S.Ct. 2777 (plurality opinion)). If the prima facie case required nothing more, employers would face potential liability for "the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." Id . at 657, 109 S.Ct. 2115 (quoting Watson , 487 U.S. at 992, 108 S.Ct. 2777 (plurality opinion)). As a result, "disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas.' " Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc. , --- U.S. ----, 135 S. Ct. 2507, 2523, 192 L.Ed.2d 514 (2015) (quoting Wards Cove , 490 U.S. at 653, 109 S.Ct. 2115 ). But racial balancing is "far from the intent of Title VII," Albemarle Paper Co. v. Moody , 422 U.S. 405, 449, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (Blackmun, J., concurring in judgment), as the statute itself makes clear: "Nothing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment ... on account of an imbalance ... with respect to the total number or percentage of persons of any race" employed. 42 U.S.C. § 2000e-2(j). Moreover, if disparate-impact *1259 liability effectively compelled racial balancing regardless of the qualification of individual employees, it would be at war with the more fundamental prohibition against disparate treatment "because of ... race," id.§ 2000e-2(a)(1) ; see Ricci v. DeStefano , 557 U.S. 557, 577-85, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), and would raise "serious constitutional questions," Inclusive Cmtys. , 135 S. Ct. at 2523 ; see Ricci , 557 U.S. at 594-96, 129 S.Ct. 2658 (Scalia, J., concurring).
For these reasons, Wards Cove required disparate-impact plaintiffs to "begin by identifying the specific employment practice that is challenged," 490 U.S. at 656, 109 S.Ct. 2115 (quoting Watson , 487 U.S. at 994, 108 S.Ct. 2777 (plurality opinion)), and then to prove that it caused the disparate impact, id . at 657, 109 S.Ct. 2115 ("As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack."); see also Meacham v. Knolls Atomic Power Lab., Inc. , 554 U.S. 84, 100, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008) (the plaintiff must "do more" than "point to a generalized policy that leads to" a disparate impact (cleaned up)). Congress later codified the requirement that the plaintiff identify "a particular employment practice that causes a disparate impact." 42 U.S.C. § 2000e-2(k)(1)(A)(i). My colleagues recognize this basic governing legal framework. Ante at 1248-50, 1250-51.
Under this framework, the decision to hire or fire workers cannot by itself form the basis for disparate-impact claims. In Smith v. City of Jackson , 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), the Supreme Court affirmed summary judgment for an employer charged with using a pay plan that adversely affected older workers. The Court explained that, under Wards Cove , "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." Id . at 241, 125 S.Ct. 1536. Rather, the plaintiffs had to identify a "specific test, requirement, or practice within the pay plan that has an adverse impact on older workers." Id . (emphasis added). Likewise, in Davis v. Cintas Corp. , 717 F.3d 476 (6th Cir. 2013), the Sixth Circuit held that, for hiring claims, the "particular employment practice" supporting the claim "cannot be the hiring system itself." Id . at 496. And, as my colleagues acknowledge, various district courts have applied these principles to conclude that "a RIF is not a particular practice subject to disparate-impact challenge under Title VII." Ante at ----. These decisions advance the basic purpose of requiring a "particular employment practice" in the first place-to prevent employers from facing large exposure for "the myriad of innocent causes that may lead to statistical imbalances." Wards Cove , 490 U.S. at 657, 109 S.Ct. 2115 (quoting Watson , 487 U.S. at 992, 108 S.Ct. 2777 (plurality opinion)).
Throughout this litigation, the plaintiffs have predicated their disparate-impact claim on "the RIF, as a whole." Appellants' Br. at 20. But as my colleagues explain, "RIF" is simply a "shorthand for downsizing a workforce." Ante at ----. Thus, the gravamen of the plaintiffs' claim is that a set of layoffs caused the racial composition of the Agency's workforce to change. The plaintiffs do not link that change to anything besides the layoffs. So, they have not identified any "particular employment practice" that caused the adverse impact, and their claim runs afoul of a key Title VII teaching: "a Title VII plaintiff does not make out a case of disparate impact simply by showing that, at the bottom line, there is racial imbalance in the work force." Wards Cove , 490 U.S. at 657, 109 S.Ct. 2115 (quotation marks omitted).
*1260 In response, the plaintiffs argue that neither pre-1991 Title VII cases (such as Wards Cove ) nor age-discrimination cases (such as Smith ) apply here. Before 1991, Wards Cove governed disparate-impact claims under both Title VII and the Age Discrimination in Employment Act (ADEA). See Smith , 544 U.S. at 240, 125 S.Ct. 1536. The operative ADEA provision, 29 U.S.C. § 623(a)(2), tracks 42 U.S.C. § 2000e-2(a)(2), the original Title VII provision that Griggs construed to give rise to disparate-impact liability. But in the Civil Rights Act of 1991, Congress disapproved certain aspects of Wards Cove , see Pub. L. No. 102-166, § 2(2), 105 Stat. at 1071; expanded disparate-impact liability under Title VII, see id . § 105, 105 Stat. at 1074-75; and left the ADEA unchanged. As a result, the plaintiffs argue, neither Wards Cove nor ADEA cases now govern disparate-impact analysis under Title VII.
The plaintiffs' argument confuses different aspects of the disparate-impact framework. What Congress disapproved was Wards Cove 's formulation of the business-necessity defense, see Pub. L. No. 102-166, § 3(2), 105 Stat. at 1071, which it narrowed. Compare Wards Cove , 490 U.S. at 659, 109 S.Ct. 2115 ("there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business"), and id . (burden of persuasion "remains with the disparate-impact plaintiff"), with 42 U.S.C. § 2000e-2(k)(1)(A)(i) (employer must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity"). But far from disapproving Wards Cove 's requirement that the plaintiff identify the "specific or particular employment practice that has created the disparate impact under attack," 490 U.S. at 657, 109 S.Ct. 2115, Congress codified that holding, in requiring the plaintiff to "demonstrate[ ]" that the employer "uses a particular employment practice that causes a disparate impact," 42 U.S.C. § 2000e-2(k)(1)(A)(i). The plaintiffs further try to distinguish a "specific" practice under Wards Cove from a "particular" practice under the statute. But that distinction is insubstantial; "specific" and "particular" are synonyms, and Wards Cove used them as such. See 490 U.S. at 657, 109 S.Ct. 2115. Moreover, since 1991, the Supreme Court repeatedly has cited Wards Cove 's holding on the need for a "specific" or "particular" employment practice as good law, see, e.g. , Inclusive Cmtys. , 135 S. Ct. at 2522-23 ; Wal-Mart Stores, Inc. v. Dukes , 564 U.S. 338, 357, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), and other courts have recognized it as such, see, e.g., Reyes v. Waples Mobile Home Park Ltd. P'ship , 903 F.3d 415, 425 (4th Cir. 2018) ; Tabor v. Hilti, Inc. , 703 F.3d 1206, 1223 (10th Cir. 2013). Finally, courts addressing the statutory requirement of a "particular employment practice" have cited Title VII and ADEA precedents interchangeably. See, e.g. , Davis , 717 F. 3d at 496-97.
The plaintiffs claim support from three cases, but none helps their position. In Aliotta v. Bair , 614 F.3d 556 (D.C. Cir. 2010), we did not decide whether a RIF qualified as a specific employment practice that could support disparate-impact liability. Instead, we affirmed summary judgment for the employer because the plaintiffs had shown no adverse impact in any event. See id . at 569-70 ("the RIF disproportionately affected younger employees"). Moreover, Council 31 v. Ward , 978 F.2d 373 (7th Cir. 1992), and Shollenbarger v. Planes Moving & Storage , 297 F. App'x 483 (6th Cir. 2008), considered disparate-impact claims predicated not on RIFs as such, but on specific decisions through which the RIFs had been implemented. See id . at 486 ("We conclude that the challenged employment practice of subjecting only certain [predominantly female]
*1261 departments to the RIF had a legitimate business justification."); Council 31 , 978 F.2d at 379 (permitting challenge to "the initial decision to concentrate the layoffs in Chicago," where "black employees are concentrated"). Neither case supports the plaintiffs' disparate-impact challenge to "the RIF, as a whole."
Finally, the plaintiffs seek to challenge the RIF under 42 U.S.C. § 2000e-2(k)(1)(B)(i), which provides that if the plaintiff "can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis," then "the decisionmaking process may be analyzed as one employment practice." In opposing summary judgment, the plaintiffs never invoked that provision, much less sought to create a triable issue on whether the Agency's decisionmaking was "capable of separation for analysis." The plaintiffs thus have forfeited this possible basis for attacking the RIF as a whole. See, e.g. , Chichakli v. Tillerson , 882 F.3d 229, 234 (D.C. Cir. 2018).
III
My colleagues do not seek to defend the plaintiffs' arguments on their own terms, but rather to recast them. They repackage the plaintiffs' broad challenge to the RIF as a much narrower attack on "the Agency's choices to (a) target the SWA and SSA job categories for elimination; and (b) allow managers to make putatively individualized, discretionary and subjective choices of which positions to winnow from other units." Ante at 1250. They thus describe this case as one involving "the practices through which an employer implements a RIF," ante at 1250, along the lines contemplated by Council 31 and Shollenbarger .
What my colleagues describe is not the case that the plaintiffs presented, either below or on appeal. Instead, the plaintiffs have consistently framed their lawsuit as a challenge to the RIF writ large. In the district court, they opposed summary judgment by arguing that "a RIF conducted due to budget cuts is a facially neutral employment practice that can be considered under disparate impact theory." Pls.' Mem., ECF Doc. 148 at 38. Then, they stated unequivocally that "the specific employment practice in this case is the RIF." Id . at 40. On appeal, the plaintiffs continued to direct their challenge to "the RIF, as a whole." Appellants' Br. at 20; accord Appellants' Reply Br. at 6 ("the RIF is the 'particular employment practice' that resulted in a disparate impact based on race"); id . at 8 ("the discriminatory 'particular employment practice' that disparately impacted Plaintiffs-Appellants was the RIF itself"). And at oral argument, the plaintiffs repeated this point no fewer than six times. See Oral Arg. 2:38 ("a RIF is a particular employment practice"); 4:24 ("the RIF was a particular employment practice"); 5:56 (challenging "the decision to lay off employees"); 9:57 ("The target is the layoff decision"); 10:23 ("plaintiffs have met their prima facie duty to identify the RIF as a particular employment practice"); 13:12 ("the RIF does meet Title VII"). As the plaintiffs pursued it, this case was about the RIF itself.
Moreover, in the district court, the plaintiffs expressly disclaimed both of the challenges now suggested by my colleagues. Far from alleging that the SWA and SSA positions were targeted for elimination, the plaintiffs posited that these positions were replaced by a new, functionally identical position of Family Support Worker (FSW). Pls.' Mem., ECF Doc. 148 at 8-11. Furthermore, the plaintiffs described the RIF as an "agency-wide" layoff driven by budget cuts, id . at 37-38, and they argued that "[n]othing" in the record *1262 "indicated that the RIF targeted particular positions," id . at 6. As for subjective judgments, the plaintiffs said in no uncertain terms, in a bolded argument heading: "The RIF was not the result of subjective decision-making." Id . at 39. The plaintiffs made these disclaimers not once, but several times. See, e.g. , id . at 3 ("there is not a single piece of evidence on the record that supports" the premise that the RIF was concentrated in "specific offices and divisions within the agency" (quotation marks omitted)); id . ("the agency undertook a neutral cost-cutting move rather than a targeted realignment"); id . at 40 ("Defendant simply cannot show that the RIF was a targeted subjective process"); Pls.' Stmt. Disputed Material Facts, ECF Doc. 148-1 at 3 ("Nothing ... indicated that the RIF targeted particular positions or was conducted as a result of individual decisions."); id . at 4 ("The personnel cuts were not driven by a targeted realignment of the Agency."). Even on appeal, the plaintiffs never sought to predicate their claim on the putative targeting of SWA and SSA positions. They do now briefly argue that the RIF was implemented through an ad hoc system of "subjective" decisionmaking, Appellants' Br. at 25-27, but parties cannot change positions on appeal, see Keepseagle v. Perdue , 856 F.3d 1039, 1053-54 (D.C. Cir. 2017).
The district court clearly identified what the plaintiffs were and were not challenging. As it explained, the plaintiffs "framed the RIF itself " as the challenged employment practice, Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc. , 246 F. Supp. 2d 394, 396 (E.D. Pa. 2005), and they affirmatively argued "that the RIF was not the result of targeted, subjective decisionmaking," id . at 395. The court further observed: "Plaintiffs might have framed the purported neutral employment practice as the elimination of the SSA and SSW positions," but they "did not elect to do so." Id . at 397. The court thus did not embrace the sweeping conclusion that worries my colleagues-that any "method of implementing" a RIF is immune from disparate-impact scrutiny. Ante at 1251. Rather, the court simply rejected the challenge presented to it, while not addressing other challenges that the plaintiffs could have made but did not.
My colleagues respond that because the Agency's specific "processes" for implementing the RIF are "properly before the court," we are not "limited to the particular legal theories advanced by the parties." Ante at 1253 (quoting Kamen v. Kemper Fin. Servs., Inc. , 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ). But Kamen simply holds that, if the parties properly present an "issue or claim," forfeiture cannot force a court to decide it under an incorrect "construction of governing law." 500 U.S. at 99, 111 S.Ct. 1711. Here, the claims challenging the Agency's specific processes are not properly before the court, for the plaintiffs repeatedly disavowed them. The plaintiffs claim only that "the RIF, as a whole" violated Title VII, and we may readily evaluate that claim based on our own assessment of the governing law. Moreover, the plaintiffs' challenge to "the RIF, as a whole" cannot be deemed an "umbrella claim," Lebron v. Nat'l R.R. Passenger Corp. , 513 U.S. 374, 381, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995) (quotation marks omitted), encompassing challenges to the RIF's constituent parts. That theory runs headlong into Title VII, which prohibits disparate-impact challenges to an employer's overall "decisionmaking process" unless the plaintiff shows that its elements are "not capable of separation for analysis," 42 U.S.C. § 2000e-2(k)(1)(B)(i) -a showing that the plaintiffs did not even attempt below. Despite my colleagues' creative efforts, the governing forfeiture rule here is a pedestrian one:
*1263 Where distinct employment practices are at issue, plaintiffs must separately preserve challenges to each one. See, e.g. , Brooks v. Grundmann , 748 F.3d 1273, 1278-79 (D.C. Cir. 2014) ; Sellers v. Deere & Co. , 791 F.3d 938, 943 n.4 (8th Cir. 2015).
The requirement of precisely identifying the challenged employment practice is no mere pleading quibble. To the contrary, it has substantial consequences in any Title VII case. Here, for example, a challenge to the alleged targeting of SWA and SSA positions would have benefitted substantially fewer prospective class members, thus also substantially reducing the expected aggregate recovery for the class. It also would have rendered irrelevant the agency-wide statistics developed by the plaintiffs' own expert, given the "essential requirement" that "the data concern those persons subject to the challenged employment practice." Carpenter v. Boeing Co. , 456 F.3d 1183, 1196 (10th Cir. 2006) ; see also Sengupta v. Morrison-Knudsen Co. , 804 F.2d 1072, 1076 (9th Cir. 1986) ("The impact of a practice on the protected class should generally be measured against the actual pool of employees affected by that practice.").[1] Likewise, a challenge to the practice of permitting individual supervisors to evaluate subordinates subjectively would have raised a host of difficulties-including objections that "merely proving that the discretionary system has produced a racial or sexual disparity is not enough" to establish a prima facie case, Wal-Mart , 564 U.S. at 357, 131 S.Ct. 2541 ; that there are obvious business justifications for permitting subjective assessments of employees, id . at 355, 131 S.Ct. 2541 ; and that localized decisionmaking forecloses the possibility of class certification, id . at 348-60, 131 S.Ct. 2541. In this context as elsewhere, our adversarial system holds litigants to their tactical choices, because it presumes that "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." Greenlaw v. United States , 554 U.S. 237, 244, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008) (quotation marks omitted).
In short, the plaintiffs challenged nothing more specific than the RIF. Because the RIF is not a "particular employment practice" within the meaning of Title VII, the plaintiffs failed to establish a prima facie case of disparate-impact discrimination. Accordingly, I respectfully dissent from Part II.A of the Court's opinion, but join the balance of Part II.

My colleagues suggest that agency-wide statistics might suffice to make the case that they sketch out. Ante at 1252-53. But a Title VII plaintiff must "demonstrate that each particular challenged employment practice causes a disparate impact." 42 U.S.C. § 2000e-2(k)(1)(B)(i). So, a case resting on (1) elimination of the SSA and SWA positions and (2) use of individual supervisors' subjective decisions to make further cuts would need separate statistical analyses of each practice.