# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 6, 2016      Decided November 15, 2016

No. 15-7126

DAVID DEJESUS,
APPELLANT

v.

WP COMPANY LLC,
DOING BUSINESS AS THE WASHINGTON POST
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01101)

*Mayer Morganroth* argued the cause and filed the brief for Appellant. With him on the brief was *Cherie Morganroth*.

*Jacqueline M. Holmes* argued the cause and filed the brief for Appellee. With her on the brief was *Eric S. Dreiband*.

Before: BROWN, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Appellant David DeJesus charges that he was improperly terminated by his employer WP Company LLC (the Washington Post), in violation of the following laws: Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e; the Civil Rights Act of 1866 (§ 1981), 42 U.S.C. § 1981; and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621. DeJesus is African-American and was, at the time of his termination, fifty-nine years old. The District Court granted summary judgment in favor of the Washington Post. We reverse and remand for further proceedings.

## I.

For over eighteen years, DeJesus sold ad space in the Washington Post. In August 2011, he was terminated by his then-supervisor, Noelle Wainwright.

Wainwright became DeJesus's supervisor in early 2008. In three annual appraisals (2008, 2009, and 2010), Wainwright generally rated DeJesus as "meet[ing] standards." J.A. 134, 199, 394. However, DeJesus's performance varied by different measures: as the Washington Post concedes, he "generated significant revenue[] and won numerous awards," but he was also rated slightly "below standards" for "getting results," "initiating action," and "managing work." Appellee's Br. at 15-16.

DeJesus alleges that, as compared to his white and under-forty colleagues, Wainwright treated him in an "edgy" and "condescending" manner. J.A. 228-29. She also made remarks that DeJesus interpreted as coded language with racial undertones, such as describing him as "speaking well." *Id.* Wainwright's attitude purportedly extended to other African Americans. An African-American manager felt Wainwright treated her differently due to her race, and

Wainwright "was condescending toward [her] and tried to order [her] around." J.A. 961. Another African-American colleague testified that Wainwright "would not speak to [her], even if [she] spoke to [Wainwright] first." J.A. 732. According to DeJesus, Wainwright was also dismissive of African-American client representatives: on one occasion, she dismissively labeled an African-American representative as "opinionated" and not "a good use of time" to pursue, although that representative subsequently authorized a $300,000 media buy. J.A. 230.

Wainwright's discrimination was, DeJesus alleges, consistent with a cultural shift at the Washington Post – an institution replacing its racially diverse and seasoned staff with a whiter and younger staff. Other employees shared DeJesus's perception, testifying that since 2008, "the management philosophy at the [Washington] Post was downsizing, attrition, eliminating and replacing older employees, offering buyouts, and forcing people out," J.A. 734; "[i]f you were 40+ years old, the [Washington] Post made sure you were leaving," J.A. 731; and "the [Washington] Post was phasing African Americans out too, across the board, and particularly upper-level positions," J.A. 732.

According to DeJesus, he was swept up in this shift in 2011, in a series of events that led to his termination. Allstate Insurance, one of DeJesus's accounts, purchased a full-page "blackout" ad about the dangers of texting while driving, in an effort to influence a bill being debated in Congress.

Allstate's ad agency, Starcom, wanted to measure the efficacy of the campaign and asked DeJesus whether the Washington Post "do[es] any sort of research, like ad recall." J.A. 774. The Washington Post had the capacity to conduct a

Research and Analysis of Media (RAM) study, which would measure the extent to which readers could recall the texting-while-driving ad. Wainwright was on vacation, so DeJesus consulted with the acting manager on his floor, who advised him to ensure that Starcom understood the parameters of a RAM study. DeJesus then communicated with the Washington Post's RAM-study coordinator, who confirmed that such a study, with certain caveats, would be appropriate. But, the window to conduct such a study was closing. Consequently, DeJesus ordered the RAM study.

The completed study was delivered to both Wainwright and DeJesus. After discovering that DeJesus had ordered the study, Wainwright instructed him to "please communicate with [her] on these types of requests," and explained that she "should have been aware of this before we decided to move forward." J.A. 781. After DeJesus apologized, Wainwright concluded, "No worries. Good story on the results." J.A. 780.

In the weeks that followed, Wainwright emphasized via email that DeJesus should deliver the RAM study to the "client" in person. DeJesus presented the study to Stacy Sharpe, Allstate's Vice President of Federal Regulatory Affairs and the driving force behind the ad campaign. DeJesus had a good working relationship with Sharpe. In the past, he had invited Sharpe, who is African-American, to an event hosted by the Washington Post. Upon learning of the invitation, Wainwright allegedly remarked that Sharpe was "not a good fit for the event," and when DeJesus invited Wainwright to sit with him and Sharpe, Wainwright declined. J.A. 557-58.

When Wainwright discovered that DeJesus presented the RAM study to Sharpe, Wainwright was displeased. DeJesus

described her reaction as "explosive," J.A. 572, but Wainwright denied raising her voice, J.A. 524. According to Wainwright, when she instructed DeJesus to present the RAM study to the "client," she meant a different Allstate executive, Karen Hornberger, who had direct authority over the ad budget. But according to DeJesus, Wainwright never mentioned Hornberger and "client" typically referred to the purchasing company, i.e. Allstate, and not any particular person in that company.

A few days later, DeJesus was informed that he was "no longer a good fit for The Washington Post" and was offered a separation package. J.A. 574. He declined that package and was subsequently terminated on August 3, 2011. In a memo entitled "Termination of Employment," Wainwright explained that DeJesus was being terminated "for willful neglect of duty and insubordination." J.A. 368. According to Wainwright, DeJesus had "ordered a RAM study for a client without seeking proper authorization from [Wainwright]" and, subsequently, failed "to follow [her] specific instructions regarding this already unauthorized RAM study." *Id.*

At the time of his termination, DeJesus was covered by a collective-bargaining agreement between the Washington Post and the Washington-Baltimore Newspaper Guild. Pursuant to that agreement, DeJesus grieved his termination on August 3, 2011, asserting that he "was terminated without good and sufficient cause." J.A. 861. The grievance went to arbitration. After a hearing, the arbitrator concluded that the Washington Post "failed to prove that the grievant engaged in 'willful neglect of duty and insubordination[,]'" as defined by the collective-bargaining agreement, and ordered that DeJesus be reinstated. J.A. 496.

DeJesus filed a Charge of Discrimination with the EEOC on May 22, 2012.  The EEOC issued a Notice of Right to Sue on April 30, 2013.  On July 18, 2013, DeJesus filed his complaint with the District Court, asserting claims of race and age discrimination, in violation of Title VII, § 1981, and the ADEA.  The District Court granted summary judgment for the Washington Post on September 29, 2015.  *DeJesus v. WP Co. LLC*, 134 F. Supp. 3d 183 (D.D.C. 2015).

## II.

We review the District Court's grant of summary judgment *de novo*.  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  In conducting our analysis, we review "the record taken as a whole." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *accord Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

In making this determination, courts must "view[] the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences accordingly." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016).  If, even then, "no reasonable jury could reach a verdict in her favor," summary judgment is properly granted. *Id.*  "[W]e are not to make credibility determinations or weigh the evidence." *Holcomb*, 433 F.3d at 895; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

7

DeJesus asserts race discrimination in violation of Title VII and § 1981.[1]  Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  To prevail, a plaintiff must demonstrate that race was "a motivating factor" for the termination.  42 U.S.C. § 2000e-2(m); *Johnson*, 823 F.3d at 706.  Likewise, "[§] 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam) (quoting 42 U.S.C. § 1981).  While Title VII and § 1981 are different in important ways,[2] "facts sufficient to support Title VII liability [under a theory of intentional race discrimination] will support § 1981 liability as well."  6 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 101.10, at 101-52 (2d ed. 2007); *see also Ayissi-Etoh*, 712 F.3d at 576-77 (analyzing a § 1981 claim using the same framework as a Title VII claim); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir.

---

[1] The record is unclear as to whether DeJesus advanced any theory of discrimination on the basis of color or national origin.  To the extent he did, his appeal makes no effort to challenge the District Court's decision on that basis.  Therefore, those arguments are waived.  *See Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 779 (D.C. Cir. 2012) ("[A] party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief.").

[2] E.g., scope of coverage (§ 1981 does not cover religious or sex discrimination), the availability of certain theories (§ 1981 is limited to intentional discrimination), and the types of employers susceptible to suit (§ 1981 contains no minimum requirement for the number of people employed by the defendant).  *See generally* MARK A. ROTHSTEIN ET AL., EMPLOYMENT LAW § 2:40 (5th ed. 2014); 6 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 101 (2d ed. 2007).

2011) ("We analyze § 1981 discrimination claims in the same manner as claims brought pursuant to Title VII of the Civil Rights Act.").

DeJesus also asserts age discrimination in violation of the ADEA. The ADEA makes it unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

Under all three statutes − Title VII, § 1981, and the ADEA − plaintiffs seeking to prove disparate treatment through indirect, circumstantial evidence employ the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ayissi-Etoh*, 712 F.3d at 576 ("In Section 1981 and Title VII cases, courts use the same framework for determining whether unlawful discrimination occurred."); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying the *McDonnell Douglas* framework to an ADEA claim). Under this formula, a plaintiff must first establish a *prima facie* case of prohibited discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The employer must then come forward with a legitimate, non-discriminatory reason for the challenged employment decision. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). If the employer meets this burden, the framework falls away and the court must decide one ultimate question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the

employee . . . ?" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Therefore, our inquiry centers on whether DeJesus produced sufficient evidence for a reasonable jury to conclude that the Washington Post's asserted non-discriminatory reason for terminating him – "willful neglect of duty and insubordination" – was not the actual reason,[3] and that the Washington Post intentionally discriminated against DeJesus on account of his race or age.[4]

## III.

According to the Washington Post, DeJesus was terminated for "order[ing] a RAM study without seeking proper authorization" and intentionally failing to present that

---

[3] DeJesus contends the arbitrator's decision that his termination violated the collective-bargaining agreement is issue-preclusive and compels the determination that the Washington Post's proffered reason is pretextual. This argument is meritless for multiple reasons, including the fact that neither discrimination nor any decisionmaker's belief was "actually litigated" in the arbitral proceedings. *See Milton S. Kronheim & Co., Inc. v. District of Columbia*, 91 F.3d 193, 197 (D.C. Cir. 1996).

[4] The Washington Post made no effort to distance itself or higher-level decisionmakers from the actions of Wainwright. Even if it had, such an effort would have been futile because Wainwright's actions – as illustrated by the memo entitled "Termination of Employment" – undisputedly caused and were intended to cause DeJesus's termination. *See Morris v. McCarthy*, 825 F.3d 658, 668-69 (D.C. Cir. 2016) (applying the cat's-paw theory of discrimination). Consequently, we treat Wainwright's actions as the actions of the Washington Post.

study to a particular person. These two acts purportedly constituted "willful neglect of duty and insubordination."[5]

As an initial matter, there may be circumstances when an employer offers several independent reasons for the challenged action, and the employee must cast doubt on each reason to overcome summary judgment. *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 69-70 (7th Cir. 1995). We are not presented with such a case. Wainwright's memo describes both the unauthorized RAM study request and the failure to properly deliver the unauthorized study as the same sin: "willful neglect of duty and insubordination." At oral argument, the Washington Post confirmed this characterization, explaining that, "it's the two things together." In other words, the two grounds for termination are so "intertwined" that they should be considered as one. *See id.* 70.

"[T]he issue is whether [Wainwright] *honestly and reasonably believed*" that DeJesus had committed "willful neglect of duty and insubordination" sufficient to warrant

---

[5] The Washington Post repeatedly mentions, but does not forcefully press, additional non-discriminatory reasons for DeJesus's termination. The memo explaining the basis for termination vaguely gestures to other "issues regarding [DeJesus's] work performance." But reading the memo as a whole, it is clear that the principal non-discriminatory reason relied upon by the Washington Post is "willful neglect of duty and insubordination" related to the RAM study, and the reference to other issues is an after-thought residual clause. Indeed, the Washington Post's General Counsel and Vice President of Labor Relations confirmed that "absent [the RAM study] incident[,] . . . [DeJesus] would [not] have been terminated." Therefore, we test the Washington Post's principal non-discriminatory reason: "willful neglect of duty and insubordination."

termination. *Brady*, 520 F.3d at 496. For three reasons, we think a reasonable jury could conclude she did not.

First, when Wainwright discovered that DeJesus had ordered the RAM study without her authorization, she instructed him to clear future requests with her, but reassured him, "No worries. Good story on the results." J.A. 574. DeJesus testified that there was no follow-up conversation. Such an unperturbed reaction to a purportedly dischargeable offense, by itself, could cast doubt on the Washington Post's proffered reason.

Second, a jury could properly conclude that the Washington Post's proffered reason is so unreasonable that it provokes suspicion of pretext. Once the RAM study was in-hand, Wainwright repeatedly emphasized via email that DeJesus should deliver it to the "client" in person. The record strongly suggests that "client" typically meant "Allstate" as a business and, therefore, Wainwright's email instructions were arguably ambiguous as to the particular Allstate official who should have received the RAM study. *See, e.g.*, Wainwright Dep. Tr. at 38:21-22, J.A. 512 ("Q: Who was the client? A: Allstate."). Wainwright testified that by "client," she meant a particular person, Hornberger, who had authority over Allstate's ad budget. DeJesus testified that Wainwright never mentioned Hornberger.

Notwithstanding the ambiguity of Wainwright's instructions, the Washington Post insists it is enough that Wainwright *honestly* believed that DeJesus's failure to properly deliver the RAM study constituted insubordination. But Wainwright's belief must have been both "honest" and "reasonable." *See Brady*, 520 F.3d at 496 ("[T]he issue is whether *the employer honestly and reasonably believed* [the proffered reason for termination]."). To be clear, courts

12

should not evaluate the reasonableness of the employer's business decisions, such as whether it made financial sense to terminate an employee who generated substantial revenue; we are not "a super-personnel department that reexamines an entity's business decisions." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (citation omitted). Rather, the factfinder is tasked with evaluating the reasonableness of the decisionmaker's *belief* because honesty and reasonableness are linked: a belief may be so unreasonable that a factfinder could suspect it was not honestly held. Here, where contractual prerequisites for such an allegation were found in the arbitration not to have been met, *see Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974) ("[A]rbitral decision[s] may be admitted as evidence and accorded such weight as the court deems appropriate."), and the supervisor's immediate response did not even hint at any irretrievable misstep, a jury could find Wainwright's interpretation of the events – that this was insubordination, not mere miscommunication – so unreasonable that it provokes suspicion of mendacity. In other words, the jury might hear Wainwright's explanation and think: "she doesn't really believe that."

Third, characterizations contained in Wainwright's termination memo offer an account of DeJesus's actions that a reasonable jury could find misleading, even mendacious. Wainwright explained that, rather than present the RAM study to Hornberger, DeJesus met only "with a local client contact with no advertising decision-making ability or budgetary oversight." J.A. 368. That "local client contact" was Sharpe, Allstate's Vice President of Federal Regulatory Affairs, who reported directly to Allstate's chairperson and was the principal force behind the texting-while-driving ad campaign that the RAM study evaluated. Five months earlier, Wainwright commended DeJesus for cultivating a

relationship with Sharpe, which Wainwright described as demonstrating DeJesus's understanding of the "who, what, when and where of decisions." J.A. 384. Sharpe, according to Wainwright at the time, was "helping to drive media decisions inside Allstate on behalf of" the Washington Post. *Id.*

Wainwright's descriptions of Sharpe are technically consistent, but in tension: "a local client contact with no advertising decision-making ability," who is also a high-level executive part of the "who, what, when and where of decisions" and "drive[s] media decisions inside Allstate." Given the temporal proximity (five months) between these dissonant descriptions, a reasonable jury could conclude that Wainwright was shading the truth enough to evince mendacity – that she deliberately exaggerated DeJesus's purported mistake in an effort to manufacture cause to terminate him.

To be sure, there is evidence that Wainwright honestly believed that DeJesus's actions were proper grounds for termination. For example, DeJesus testified that Wainwright had an "explosive" reaction to learning about his presentation to Sharpe instead of Hornberger, evincing genuine anger and frustration (although, Wainwright herself disputed this account). Indeed, some aspects of the Washington Post's proffered reason may be more credible than others. But, as explained above, those aspects are so "intertwined" that they rise and fall together. *See Russell*, 51 F.3d at 70.

In sum, a jury could conclude that Wainwright's "no worries" reaction demonstrated that the unauthorized RAM study was not a big deal, her interpretation of DeJesus's actions as insubordination was so unreasonable that it could not be honestly held, and her shaded characterization of

Sharpe suggests an overall lack of forthrightness. At this stage, we "view[] the evidence in the light most favorable to" DeJesus and are obligated to "draw[] all reasonable inferences accordingly." *See Wheeler*, 812 F.3d at 1113. We therefore conclude that a reasonable jury could find that the Washington Post's proffered non-discriminatory reason – "willful neglect of duty and insubordination" – "was not the actual reason" for DeJesus's termination. *See Brady*, 520 F.3d at 494.

If there is sufficient cause to doubt the Washington Post's proffered reason, what additional showing of intentional discrimination must DeJesus make to survive summary judgment? There is no easy answer. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc) ("[I]t is difficult, if not impossible, to say in any concise or generic way under what precise circumstances [an inference of intentional discrimination based on a demonstration of pretext alone] will be inappropriate."). This Court could "do no better than to quote [*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)]:" "In an appropriate case, 'the factfinder's disbelief of the reasons put forward by the defendant' will allow it to infer intentional discrimination." *Aka*, 156 F.3d at 1294 (quoting *Hicks*, 509 U.S. at 511). Although "rebuttal evidence alone will not always suffice to permit an inference of discrimination," *id.* at 1292, "we do not routinely require plaintiffs 'to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment[,]'" *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka*, 156 F.3d at 1290). Moreover, "[i]f 'disbelief is accompanied by a suspicion of mendacity,' . . . the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more readily." *Aka*, 156 F.3d at 1294 (quoting *Hicks*, 509 U.S. at 511). For

the reasons explained above, we think a reasonable jury could suspect mendacity on the part of Wainwright.

But, for good measure, DeJesus has furnished evidence of intentional discrimination that bolsters his claims. As to both race and age discrimination, DeJesus submitted "independent evidence of discriminatory statements or attitudes on the part of the employer." *Id.* at 1289.

Wainwright allegedly was "edgy" and "condescending" to DeJesus, as compared to his white colleagues. J.A. 551, 559. She made comments susceptible to being interpreted as race-inflected code, such as describing both DeJesus and Sharpe as "not a good fit," J.A. 574, complimenting DeJesus for "speaking well," J.A. 228-29, and dismissing an African-American client representative as "opinionated," J.A. 230. Several African-American colleagues corroborated DeJesus's account, testifying that Wainwright was especially condescending to and dismissive of them, refusing to respond to an African-American colleague even if the colleague spoke first. These accounts may be false, or it may well be that Wainwright was an equal-opportunity bully. But it is the province of a jury to credit, or not credit, this testimony.

It may be argued that these statements and attitudes are immaterial because they do not concern the employment decision – termination – in controversy. "Although we have found that an isolated race-based remark unrelated to the relevant employment decision could not, without more, permit a jury to infer discrimination, we have not categorically labeled such comments immaterial." *Morris*, 825 F.3d at 669-70 (citation omitted). Indeed, a reasonable jury could treat evidence of a decisionmaker's broad-based racial animus or bias as corroborating evidence that such animus or bias infected a particular employment decision; it is

not unreasonable to doubt that an employer quarantines her animus or bias to day-to-day treatment of colleagues, away from decisions about hiring, or promotion, or termination. Wainwright's comments and attitude bear on the central question in this case: were Wainwright's employment decisions motivated by race?

Likewise, a reasonable jury could conclude that, but for the fact that DeJesus was fifty-nine years old, he would not have been terminated. *See Gross*, 557 U.S. at 178. Higher-level management, who were "100% supportive" of the termination, ratified Wainwright's decision with little apparent discussion. J.A. 857. That "management['s] philosophy" since 2008 was, according to a former employee, "downsizing, attrition, eliminating and replacing older employees[.]" J.A. 734. In support of this characterization, the former employee described four specific instances in which top-level management purportedly "forced out" older employees due to their age. J.A. 735-38. Another former employee identified two departments in which management "[got] rid of excellent older employees in order to put younger people in[.]" J.A. 731. She explained that, "if you were 40+ years old, [t]he [Washington] Post made sure you were leaving."[6] *Id.* It would not be an unreasonable stretch – if the Washington Post's proffered reason is deemed pretextual – for a jury to conclude that when Wainwright presented the chance to terminate a fifty-nine-year-old employee, DeJesus was rushed out the door because of his age.[7]

---

[6] The Washington Post did not object to or move to strike the affidavits of either of these former employees.

[7] During discovery, DeJesus attempted to obtain information about employees who, like him, were offered buyouts. The District Court concluded that "allowing discovery about employees who

By resolving these fact-bound questions in the Washington Post's favor, the District Court committed error.

**IV.**

For the foregoing reasons, we reverse the grant of summary judgment by the District Court and remand for further proceedings.

*So ordered.*

---

voluntarily resigned would likely require the [Washington] Post to disclose substantial information that is irrelevant to De[J]esus's claims." However, the heart of DeJesus's claim is that these voluntary resignations (i.e. buyouts) were not, in fact, voluntary; DeJesus asserts that these buyouts were coerced and if the employees rejected the offers, like he did, they would have been terminated. Our case law does state buyouts are "presumed" voluntary, *see Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010), but this presumption can be overcome, *id.* at 566-67 (describing cases). Here, the District Court's discovery order deprived DeJesus of the very mechanism – information about the overlap between employees receiving buyout offers and employees being terminated – that would have enabled him to rebut the "voluntariness" presumption. When a terminated plaintiff's theory is that his buyout offer was not voluntary, information about employees who accepted buyouts is not irrelevant, especially in light of the liberal rules governing discovery. *See* 8 CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2008 (3d ed. 2010) ("Certainly the requirement of relevancy should be construed liberally and with common sense, rather than in terms of narrow legalisms.").