**FIRST DIVISION
BARNES, P. J.,
MERCIER, and LAND, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**April 17, 2023**

# In the Court of Appeals of Georgia

A23A0685. WYATT v. METROPOLITAN ATLANTA RAPID TRANSIT AUTHORITY.

BARNES, Presiding Judge.

Harold Wyatt appeals from the trial court's order granting summary judgment in favor of the Metropolitan Atlanta Rapid Transit Authority ("MARTA") on Wyatt's claims brought against MARTA pursuant to the Georgia Whistleblower Act, OCGA § 45-1-4 ("GWA"). Because the trial court applied an incorrect legal analysis in evaluating whether Wyatt met his burden of presenting evidence that MARTA's proffered reason for terminating him was pretextual, we vacate the trial court's order and remand for further action consistent with this opinion.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). "Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met." *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010). On appeal from the grant of summary judgment, "[w]e must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." *Tuohy v. City of Atlanta*, 331 Ga. App. 846, 846 (771 SE2d 501) (2015). So viewed, the evidence showed the following.

MARTA hired Wyatt in October 2007. After serving as a bus maintenance supervisor and then as rail maintenance supervisor, Wyatt was promoted to the role of Safety Operational Officer ("SOO") in MARTA'S Department of Safety and Quality Assurance ("Safety Department") in June 2016. As an SOO, Wyatt's duties included investigating rail and bus accidents and inspecting equipment, stations, and operations to detect unsafe conditions. During his tenure as an SOO, Wyatt was selected to represent MARTA at an out-of-state safety conference. And, prior to the events at issue in this case, Wyatt was never subjected to any disciplinary action at MARTA, other than two "write-ups" that were later rescinded.

In early 2019, a group of SOOs, including Wyatt, began meeting regularly to discuss their safety concerns, including that MARTA was not complying with applicable safety regulations and policies. During those meetings, Wyatt expressed his concerns about MARTA improperly critiquing and editing reports submitted to the Georgia Department of Transportation ("GDOT"), about electrical power and equipment issues, and about harassment and retaliation for bringing up safety problems. The SOOs discussed the need to raise their safety concerns with GDOT because they did not believe that MARTA was addressing them.

That same year, Wyatt began raising his safety concerns with Safety Department management. In January 2019, Wyatt complained to management that emergency lighting checks at MARTA stations were not being overseen by SOOs as required by the pertinent regulations and policies. He subsequently complained to management that MARTA was improperly preventing SOOs from attending Project Initiation Meetings, which he believed was a safety hazard that violated MARTA's policies and governing regulations, and that MARTA was not implementing procedures it had promised GDOT and the Federal Transit Authority that it would implement to prevent fatalities. Additionally, Wyatt complained to management about

directives received by the SOOs to report wayside fires as "smoke events" in violation of applicable polices and regulations.

On May 6, 2019, GDOT received an anonymous email from "Concerned Safety Advocates" alleging that MARTA's "safety department [was] in a state of crisis and in violation of its own safety plans, policies and procedures." While Wyatt did not compose or send the email, the email complained of many of the safety violations that Wyatt and the other SOOs had discussed in their meetings. As a result of the anonymous email, GDOT notified MARTA that it was initiating an investigation into allegations that MARTA was not complying with its public transportation agency safety plan. See 49 CFR § 674.25 (c). MARTA informed the Safety Department staff, including Wyatt, about the GDOT investigation.

In July or August 2019, Wyatt met with several individuals, including Reginald James, the Director of Safety for the Safety Department, and expressed his concern that SOOs were experiencing harassment, bullying, and retaliation in the wake of the anonymous email sent to GDOT. Following the meeting, Director James accused Wyatt of being the "ringleader" of the SOOs and remarked that the other SOOs were following Wyatt with respect to safety issues.

Beginning in September 2019 and over the ensuing months, Safety Department management subjected Wyatt to what he described as a "flurry of discipline." Although he had not faced any serious discipline in his prior twelve years of employment with MARTA, management began accusing Wyatt of failing to comply with various Safety Department policies and directives and suspended him twice for alleged disciplinary infractions, once in February 2020 and again in March 2020. Wyatt disputed most of the alleged infractions and argued that there was no basis for his suspensions. After Wyatt and the other SOOs raised their concerns about MARTA's safety compliance, Safety Department management also required them to sign a confidentiality agreement or face termination. "To protect [his] job," Wyatt signed the confidentiality agreement even though he believed that the agreement was illegal.

At the same time that he was being accused of disciplinary infractions, Wyatt raised additional safety concerns with Safety Department management, including his concerns that SOOs were not following GDOT approved policies and procedures pertaining to the control and investigation of major accidents and that MARTA was not following protocols to keep railway accident scenes safe. Wyatt also informed management that he believed that MARTA was violating its Alertness Assurance

5

Policy by having SOOs work for extended hours without adequate rest. Additionally, Wyatt did not respond to a stabbing incident at a rail station because he was concerned that having SOOs (rather than trained law enforcement officers) respond to stabbings was inconsistent with MARTA's safety plan. During one meeting with management in which Wyatt expressed his safety concerns about responding to stabbings and shootings, Ella Martin-Lee, the Manager of Safety for the Safety Department, asked Wyatt if he "wanted [his] job."

In March 2020, Wyatt emailed MARTA's chief legal counsel, complaining that MARTA was in violation of the GWA and the Federal Whistleblower Act and that as a result of the anonymous email sent to GDOT, SOOs were being "harassed and bullied" by Safety Department management and were working under a "culture of fear." He also submitted two complaints to MARTA's Human Resources ("HR") Department (one in February 2020 and another in March 2020), alleging that MARTA had improperly suspended him on two occasions and was subjecting him to harassment, intimidation, and retaliation. In an uncommon occurrence at MARTA, the HR Department did not investigate Wyatt's complaints and instead "placed [them] on hold" and referred the matter to MARTA's legal counsel.

6

After Wyatt submitted his complaints to the HR Department, on April 17, 2020, Safety Department management placed Wyatt on a Performance Improvement Plan ("PIP"), listing "interpersonal skills," "following established protocols," "following the chain of command," and "insubordination" as "Areas of Concern." (Internal capitalization omitted.) The PIP stated that Wyatt would "receive feedback on [his] progress according to the following schedule" and then listed the dates of May 18, 2020, June 18, 2020, and July 17, 2020. However, on March 19, 2020, Gena Major, the Assistant General Manager ("AGM") of the Safety Department, sent an email to MARTA's chief legal counsel noting that the PIP was being suspended and that this was "different from the guidance" discussed with counsel. Subsequently, on April 30, 2020, AGM Major emailed the HR Department to recommend that Wyatt be terminated because he "stubbornly continued to ignore management directives."

On May 13, 2020, Manager Martin-Lee circulated to Director James a recommendation for Wyatt's termination, asserting that Wyatt's "willful failure to perform the requirements of his job in a satisfactory manner exposes [MARTA] and its employees to safety risks." The recommendation recited the following chronology of Wyatt's disciplinary history: (1) on September 6, 2019, Wyatt received oral counseling for failing to report an accident involving a fatality to his senior SOO; (2)

7

on September 12, 2019, Wyatt received oral counseling for failing to submit a weekly status report on time; (3) on February 19, 2020, Wyatt signed an operational directive to provide updated information when reporting to the scene of incidents while performing on-call duties; (4) on February 24, 2020, Wyatt received a five-day suspension for failing to follow protocol in responding to incidents and accidents; (5) on March 11, 2020, Wyatt received a second five-day suspension for failing to properly report back to work after his first suspension; (6) on April 17, 2020, Wyatt was placed on a PIP; (7) on April 22, 2020, Wyatt failed to provide updated information to management about a wayside fire, with the result that MARTA missed its deadline for notifying GDOT about the incident; (8) on April 26, 2020, Wyatt failed to turn in a report that was due that day after being reminded to do so earlier that month; and (9) on May 1, 2020, Wyatt failed to attend a COVID-19 mask distribution event. That same day, Director James and AGM Major concurred in the recommendation for termination, as reflected by their signatures on the form, and Manager Martin-Lee completed a "Termination Record" in which she checked the box indicating that Wyatt was being terminated for "Unsatisfactory Performance" and wrote "Failure to Follow Protocols" in the "Comments" section of the form. The form

8

was signed by Manager Martin-Lee and Director James under the section entitled "Termination Approval."

Also on May 13, 2020, Wyatt received a written notice of termination from Manager Martin-Lee. The notice stated, "Please be advised effective close of business today your employment with MARTA is terminated for unsatisfactory performance." The notice listed the same disciplinary history as set forth in Manager Martin-Lee's recommendation for termination, except for the failure to turn in the report by the April 26, 2020 deadline.

Two of the other SOOs who were "most vocal" about raising safety concerns also were terminated by MARTA. No other SOO who held that position at the time the anonymous email was sent to GDOT remains in that role.[1]

---

[1] In May 2021, GDOT issued a report of its findings from its investigation prompted by the anonymous email. The GDOT report found several instances of safety and other violations by MARTA, consistent with the allegations of Wyatt and the other SOOs, and required MARTA to institute certain corrective actions. The report also found that Wyatt's February 2020 suspension violated MARTA's policy on harassment and retaliation. On appeal, MARTA contends that GDOT's findings contained in the report were inadmissible for purposes of summary judgment. But the trial court did not rule on the admissibility issue. "Therefore, we will not address the admissibility of such evidence in the first instance and instead will consider only whether the record as we now find it is enough to get [Wyatt] past summary judgment." (Citation and punctuation omitted.) *Richey v. Kroger Co.*, 355 Ga. App. 551, 551, n.1 (845 SE2d 351) (2020).

9

In July 2021, Wyatt brought the present action against MARTA, alleging that MARTA's adverse employment actions against him, including his termination, violated the GWA. Following discovery, Wyatt filed a motion for partial summary judgment on two elements of his claim: that MARTA was a public employer within the meaning of the GWA and that Wyatt's termination constituted an adverse employment action under the statute. MARTA also filed a motion for summary judgment seeking the dismissal of Wyatt's GWA claims in their entirety. MARTA contended that Wyatt could not establish a prima facie case under the GWA, that it had a legitimate, non-retaliatory reason to terminate Wyatt's employment, and that Wyatt could not show that its proffered reason for his termination was pretextual.

The trial court issued its final order in October 2022. The trial court granted Wyatt's motion for partial summary judgment, concluding that the uncontroverted evidence showed that MARTA was a public employer and that Wyatt's termination amounted to an adverse employment action under the GWA. Addressing MARTA's motion for summary judgment, the trial court found that Wyatt made out a prima facie case of retaliation, but that MARTA articulated legitimate, non-retaliatory reasons for the termination and Wyatt failed to come forward with sufficient evidence to create a genuine issue of material fact as to whether each of MARTA's proffered reasons

10

was pretextual.[2] Consequently, the trial court granted MARTA's motion for summary judgment. This appeal by Wyatt followed.[3]

We begin with a summary of the applicable statutory scheme. The GWA prohibits a public employer from retaliating against a public employee for "disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a government agency," OCGA § 45-1-4 (d) (2), or "for objecting to, or refusing to participate in, any activity, policy, or practice of the public employer that the public employee has reasonable cause to believe is in violation of or noncompliance with a

[2] The trial court also ruled that based on the applicable statute of limitation, Wyatt could proceed with his GWA claim against MARTA for his alleged wrongful termination. However, the trial court ruled that Wyatt could not bring separate and independent GWA claims against MARTA for any retaliation that occurred before his termination, including his February 2020 and March 2020 suspensions, because those claims were time barred. Wyatt does not challenge these rulings by the trial court on appeal, and thus we do not address them. See *Morris v. Mullis*, 264 Ga. App. 428, 431 (590 SE2d 823) (2003) ("We do not consider issues not raised on appeal.").

[3] After the trial court issued its final order, Wyatt filed a motion for reconsideration. In November 2022, after Wyatt filed his notice of appeal from the final order, the trial court entered an order denying his motion for reconsideration. "It is well settled that a notice of appeal of a judgment divests the trial court of jurisdiction to consider a motion for reconsideration of that judgment, and thus the trial court lacked jurisdiction to rule on [Wyatt's] motion for reconsideration." *Mughni v. Beyond Mgmt. Group*, 349 Ga. App. 398, 402 (3) (825 SE2d 829) (2019). The trial court's November 2022 order therefore "is ineffective and cannot be considered on appeal." *In the Interest of J. F.*, 310 Ga. App. 807, 808 (714 SE2d 399) (2011).

11

law, rule, or regulation." OCGA § 45-1-4 (d) (3). Prohibited retaliation includes the discharge of the employee. OCGA § 45-1-4 (a) (5).

Based on the statutory language, we have held that to succeed on a GWA claim, the public employee must show "that (1) he was employed by a public employer; (2) he made a protected disclosure or objection; (3) he suffered an adverse employment action [such as being discharged]; and (4) there is some causal relationship between the protected activity and the adverse employment action." (Citation and punctuation omitted.) *Baptiste v. Mann*, 360 Ga. App. 345, 348 (861 SE2d 212) (2021).

> When analyzing claims brought under the [GWA], we apply the same burden-shifting analysis established by the United States Supreme Court for retaliation cases brought under Title VII of the Civil Rights Act of 1964. See *McDonnell Douglas Corp. v. Green*, 411 U. S. 792, 802-803 (II) (93 SCt 1817, 36 LE2d 668) (1973). Under this framework, the plaintiff must first make a prima facie case of retaliation. If the plaintiff makes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, [non-retaliatory] reason for the employment decision. If the employer successfully meets this burden of production, then the burden shifts back to the plaintiff to show that each proffered reason was pretext.

(Citations and punctuation omitted.) *Franklin v. Pitts*, 349 Ga. App. 544, 547 (826 SE2d 427) (2019). Mindful of this statutory framework, we turn to Wyatt's specific arguments raised on appeal.

1. Wyatt argues that the trial court erred in applying the *McDonnell Douglas* burden-shifting framework because he presented direct evidence of retaliation. According to Wyatt, direct evidence of retaliation exists when there is evidence showing, without reliance on inference, a causal connection between the employee's protected activity and the adverse employment action taken against the employee, and he asserts that such evidence exists in this case. Specifically, Wyatt maintains that the record shows that Safety Department management suspended him in February 2020 for engaging in statutorily protected activity under the GWA (namely, refusing to respond to a stabbing at a rail station on February 23, 2020 because he believed that doing so would violate safety policies) and then used that suspension as part of the justification for his termination, such that there was a causal connection between his protected activity and his termination. Wyatt argues that in light of this direct evidence of retaliation, the *McDonnell Douglas* framework was inapplicable and the trial court's grant of summary judgment to MARTA was improper.

We agree with Wyatt that the *McDonnell Douglas* burden-shifting framework does not apply when there is direct evidence of retaliation. See *Bailey v. Stonecrest Condo. Assn.*, 304 Ga. App. 484, 488 (1) (696 SE2d 462) (2010) (explaining that the *McDonnell Douglas* framework only comes into play "[i]f no direct evidence of discrimination is shown"); *Brown v. Allied Printing Ink Co.*, 241 Ga. App. 310, 312 (2) (526 SE2d 626) (1999) (pointing out that the *McDonnell Douglas* framework applies "in the absence of direct . . . evidence of intentional discrimination"). See also *Jefferson v. Sewon America*, 891 F3d 911, 922 (III) (B) (2) (11th Cir. 2018) (noting that "[w]hen a plaintiff proves a case of discrimination by direct evidence, application of *McDonnell Douglas* is inappropriate," and concluding that because the plaintiff "presented direct evidence of discrimination, the district court erred when it evaluated [the] evidence under the burden-shifting test for circumstantial evidence established in *McDonnell Douglas*") (citations, punctuation, and emphasis omitted).[4] But we disagree with Wyatt that the evidence of his February 2020 suspension and subsequent termination amounted to direct evidence of retaliation.

---

[4] In utilizing the *McDonnell Douglas* framework to address discrimination and retaliation cases, "we have previously relied on, and found persuasive, cases from the Eleventh Circuit." *Baptiste*, 360 Ga. App. at 349.

14

In classifying evidence as direct or circumstantial for purposes of determining the application of the *McDonnell Douglas* framework, we have explained that

> [d]irect evidence is evidence that establishes the existence of [retaliatory] intent behind the [employment] decision without any inference or presumption. . . . Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to [retaliate] on the basis of some impermissible factor. . . . Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion[, and] evidence merely suggesting [retaliation] does not constitute direct evidence.

(Citations and punctuation omitted.) *Bailey*, 304 Ga. App. at 488-489 (1) (a). See *Jefferson*, 891 F3d at 921-922 (III) (B) (2) (noting that "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination") (citation and punctuation omitted); *Fernandez v. Trees, Inc.*, 961 F3d 1148, 1156 (III) (B) (11th Cir. 2020) ("Direct evidence of discrimination is evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee and, if believed, proves the existence of a fact without inference or presumption.") (citation and punctuation omitted).

15

The evidence relating to Wyatt's February 2020 suspension and his May 2020 termination falls short of the standard for direct evidence because it does not establish, without inference or presumption, that MARTA retaliated against him for his refusal to respond to the scene of the stabbing incident. MARTA's "Corrective Action Form" for Wyatt's February 2020 suspension states that he was suspended based on four incidents on four separate dates in February, only one of which related to the February 23, 2020 stabbing incident, and that he "failed to contact upper leadership on any [of the] incidents" and that "[a]ny more violations of this nature can and will lead to termination." In describing Wyatt's infractions for the stabbing incident, the form specifically refers to Wyatt's "fail[ure] to notify upper leadership about the incident" and his decision "to take instructions on whether to respond to incidents or accidents from MPD [MARTA Police Department] dispatchers." Additionally, the recommendation for termination written by Manager Martin-Lee and the notice of termination that she sent to Wyatt rely on his cumulative disciplinary history from September 2019 to May 2020 to justify his termination for unsatisfactory performance and do not refer specifically to the February 23, 2020 stabbing.

16

Taken together, this documentary evidence, construed in favor of Wyatt as the non-moving party, shows that Wyatt's February 2020 suspension was based in part on the February 23, 2020 stabbing incident, but that Wyatt was written up for that incident only for failing to communicate with management and for taking directions from a MPD dispatcher. The documentary evidence further reflects that, at most, the February 2020 suspension was part of the disciplinary history extending over the course of several months that was recited as cumulatively forming the reason for Wyatt's termination. Given this record, for a jury to find a causal relationship between Wyatt's refusal to respond to the scene of the stabbing out of concern that he would be violating safety policies and his subsequent termination would "require . . . an inferential leap between fact and conclusion." (Citation and punctuation omitted.) *Bailey*, 304 Ga. App. at 489 (1) (a). Because this is not the type of blatant, "smoking gun" evidence that amounts to direct evidence of retaliation, the trial court committed no error in applying the *McDonnell Douglas* framework in this case. See *Brown*, 241 Ga. App. at 312 (2) (pointing out that the *McDonnell Douglas* framework applies unless there is "direct, 'smoking gun' evidence").[5]

---

[5] Wyatt argues that MARTA admitted in its brief in support of its motion for summary judgment that his February 2020 suspension was based in part on his failure to respond to the stabbing at the rail station. "It is well established that a party may

17

2. Wyatt contends that even if the *McDonnell Douglas* burden-shifting framework applies in this case, the trial court – after determining that Wyatt had made out a prima facie case of retaliation and that MARTA had proffered legitimate, non-retaliatory reasons for his termination – erred in concluding that he failed to show that MARTA's proffered reasons were pretextual. In addressing the pretext component of the *McDonnell Douglas* framework, the trial court recited that to survive summary judgment, Wyatt was required to come forward with evidence showing that each legitimate, non-retaliatory reason proffered by MARTA for his termination was pretextual. The trial court then determined that the uncontroverted evidence showed that Wyatt had violated MARTA's policies and procedures "when he worked without

make admissions in judicio in their pleadings, motions and briefs," and such admissions are treated as "conclusive of the facts [admitted] therein." (Citations and punctuation omitted.) *Leary v. Perdue Farms*, 359 Ga. App. 123, 125 (1) (856 SE2d 772) (2021). See *Mansell 400 Assocs. v. Entex Information Svcs.*, 239 Ga. App. 477, 482 (519 SE2d 46) (1999) (on motion for reconsideration) ("Solemn admissions in judicio as made in the pleadings are conclusive against the party making them, unless formally withdrawn from the pleadings[.]") (citation and punctuation omitted). However, we do not construe MARTA's brief as an admission that Wyatt was suspended for refusing to respond to the stabbing incident. While MARTA recites in its brief that Wyatt failed to report to management and violated an agency rule by not responding to the stabbing incident, MARTA in the same paragraph describes the basis for his suspension as the "cumulation of several instances where [Wyatt] failed to properly communicate up his chain of chain despite being instructed specifically to do so." Where a party's statement is at best ambiguous, it does not constitute a binding admission. See *Mansell 400 Assocs.*, 239 Ga. App. at 482.

his badge and tailgated to gain access to secured areas"[6] upon returning back to work in March 2020 after his first suspension, and when he failed to timely turn in a report that was due by April 26, 2020. The trial court then went on to conclude that Wyatt had failed to show that his termination for those specific infractions was pretextual and thus could not succeed on his GWA claim.

(a) Wyatt first argues that the trial court erred in its analysis because there was no evidence produced by MARTA that his tailgating in March 2020 and his failing to timely submit the report in April 2020 were among the infractions that factored into his termination for unsatisfactory performance. See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-255 (II) & n. 9 (101 SCt 1089, 67 LE2d 207) (1981) (explaining that after the plaintiff makes out a prima facie case of discrimination, "[t]he burden . . . shifts to the defendant[ ] . . . to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] . . . for a legitimate, nondiscriminatory reason"; that "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the

---

[6] "Tailgating" refers to the circumstance where a MARTA employee gains entry through a secure access door without using his own identification badge by following closely another employee who has just scanned his badge.

19

plaintiff's [termination]"; and that "[a]n articulation not admitted into evidence will not suffice"). We disagree.

The record reflects that in her email to Director James recommending that Wyatt be terminated, Manager Martin-Lee recited as part of Wyatt's disciplinary history that he had been suspended a second time in March 2020 "for failing to properly report back to work." Wyatt's notice of termination for "unsatisfactory performance" also referenced his second suspension "for failing to properly return to work." As to what constituted "properly" returning to work, Director James testified in his deposition that to work at MARTA, an employee must have his badge and equipment, but that Wyatt had failed to retrieve his badge after his first suspension and instead had tailgated to gain entry when he returned to work in violation of MARTA policy and procedure. Hence, MARTA produced some evidence that Wyatt's tailgating when he returned to work in March 2020 was one of the infractions that factored into his termination for unsatisfactory performance.

MARTA also produced evidence that Wyatt's failure to turn in a final report by its April 2020 deadline was one of the infractions that factored into his termination, as that infraction was listed in Manager Martin-Lee's email recommending that Wyatt be fired. And although that infraction was not also listed

20

in Wyatt's notice of termination, that did not preclude MARTA from relying on the infraction under the *McDonnell Douglas* burden-shifting framework. See *Harris v. City of Atlanta*, 345 Ga. App. 375, 379 (2) (b) (813 SE2d 420) (2018) (indicating that employer's "overall justification" for terminating employee as supported by the evidence should be considered under the *McDonnell Douglas* framework, even if the employee was not provided the same reason for his termination at the time he was fired).

Accordingly, there was evidence that Wyatt's tailgating in March 2020 and his failure to timely submit a final report in April 2020 factored into his termination for unsatisfactory performance. It follows that the trial court did not err in taking into account those infractions in applying the *McDonnell Douglas* framework.

(b) Wyatt next contends that even if the trial court was authorized to take into account his disciplinary infractions for tailgating in March 2020 and for failing to timely submit a final report in April 2020, the court erred by treating those infractions as separate, standalone non-retaliatory reasons for his termination, and then finding that he could not succeed on his GWA claim because he failed to show pretext as to those two reasons. Wyatt asserts that MARTA's proffered legitimate, non-retaliatory reason for his termination was unsatisfactory performance based on the cumulative

effect of his disciplinary history. And because his alleged disciplinary infractions were viewed in their totality by MARTA in determining that his performance was unsatisfactory, Wyatt argues that he should not have been required to separately rebut each and every alleged disciplinary infraction to survive summary judgment. We agree.

Once the defendant employer meets its burden to proffer a legitimate, non-retaliatory reason for the termination, the burden shifts to the plaintiff employee to show "that each proffered reason was pretextual." *Thompson v. DeKalb County*, 363 Ga. App. 61, 67 (1) (c) (870 SE2d 558) (2022). See *Combs v. Plantation Patterns*, 106 F3d 1519, 1543 (V) (11th Cir. 1997) (noting that the plaintiff must "produc[e] evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions").

> A plaintiff asserting a claim under the [GWA] establishes pretext by a direct showing that a discriminatory reason more likely motivated the defendant or by an indirect showing that the defendant's explanation is not credible. To avoid summary judgment, a plaintiff must present significantly probative evidence on the issue of pretext because the plaintiff has the burden of establishing pretext. A defendant's given reason is not pretextual unless it is shown both that the reason was false, and that discrimination or retaliation was the real reason. If the proffered reason is one that might motivate a reasonable employer, an employee

22

must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason, or showing that the decision was based on erroneous facts.

(Citation, punctuation, and emphasis omitted.) *Franklin*, 349 Ga. App. at 557 (2).

In addressing pretext in the present case, the trial court granted summary judgment to MARTA on the basis that Wyatt could not prove that his disciplinary infractions for tailgating in March 2020 and for failing to timely submit a final report in April 2020 were pretextual, such that he "[had] not rebutted each proffered reason" asserted by MARTA for his termination. The trial court focused solely on those alleged infractions, treating each of them as a proffered legitimate, non-retaliatory reason for Wyatt's termination that he had to independently rebut, and the court did not consider whether Wyatt had presented any other evidence of pretext. The trial court also emphasized that Wyatt asserted in his brief opposing summary judgment that Safety Department management lacked a good faith belief that "*many (if not all)*" of his alleged disciplinary infractions occurred, thereby implying by his assertion that he may have committed at least some of the infractions.

The trial court erred in its analysis because the record reflects that MARTA proffered that it terminated Wyatt not for a single, standalone disciplinary infraction,

23

but rather for unsatisfactory performance predicated on a pattern of infractions. In this regard, MARTA proffered in its statement of undisputed facts that "Wyatt was terminated for unsatisfactory performance" and that his

> termination was based on series of repeated missteps over a period of time; including failures to follow directives; showing no sense of urgency in submitting time-sensitive reports; communication lapses; insubordination; substituting his own judgment for that of management's; repeatedly challenging direction or instruction; and routinely disregarding management directives.

And its brief in support of its motion for summary judgment, MARTA asserted:

> The undisputed evidence establishes that Wyatt had a pattern of bad behavior culminating in . . . back-to-back suspensions and a PIP. Management's hope was that these corrective actions would get Wyatt's attention and motivate him to change. Ultimately, however, given the methodical manner in which Wyatt disregarded directions and put public safety at risk, he left MARTA little choice but to terminate his employment for unsatisfactory performance. On the heels of a series of Wyatt's misdeeds in proximity that included failing to follow directives, untimeliness of submitting reports, poor communication, and insubordinate behavior, he was terminated.

In support of its proffered reason for terminating Wyatt, MARTA relied on the deposition testimony of its designated agency representative,[7] who testified in her Rule 30 (b) (6) deposition that Wyatt was terminated for "unsatisfactory performance" based on "a series of events that occurred over a period of time," and on the deposition testimony of Safety Department management personnel that Wyatt was terminated for unsatisfactory performance for routinely not following directives and continuing to substitute his own judgment for that of management. Additionally, in her email recommending Wyatt's termination, Manager Martin-Lee relied on his disciplinary history over several months to justify her conclusion that Wyatt had "willful[ly] fail[ed] to perform the requirements of his job in a satisfactory manner," and Wyatt's notice of termination likewise recited a list of infractions as forming the basis for his termination for "unsatisfactory performance."

As shown by this record, MARTA's proffered reason for Wyatt's termination was unsatisfactory performance based on the totality of his disciplinary infractions rather than on each infraction viewed independently. Because MARTA proffered that Wyatt was terminated for unsatisfactory performance as a result of the cumulative effect of his infractions, the trial court should have treated MARTA's explanation for

[7] See OCGA § 9-11-30 (b) (6) ("Rule 30 (b) (6)").

25

his termination as a single justification that Wyatt had to show was pretextual. See

*Wallace v. Seton Family of Hosps.*, 777 Fed. Appx. 83, 89 (II) (A) (c) (5th Cir. 2019)

(per curiam) ("[The defendant employer] asserts that [the plaintiff employee] was

fired for the cumulative effect of her attendance issues and her conflicts with her

co-workers which occurred during her introductory period. [The defendant] does not

assert that each reason was an independent reason for terminating [the plaintiff];

therefore, we must treat [the defendant's] reasons for terminating [the plaintiff] as a

single justification."); *DeJesus v. WP Co. LLC*, 841 F3d 527, 533 (III) (D. C. Cir.

2016) (concluding that the two asserted grounds for termination "should be

considered as one," where the plaintiff's "unauthorized RAM study request and . . .

failure to properly deliver the unauthorized study" were treated by the employer "as

the same sin" of "willful neglect of duty and insubordination" and the employer

explained that it was "the two things together" that led to the plaintiff's termination)

(citation omitted); *Laxton v. Gap, Inc.*, 333 F3d 572, 580 (IV) (B) (5th Cir. 2003)

(treating the employer's grounds for discharging employee as one justification where

employer proffered that it was the "cumulative effect" of many infractions that led to

the employee's discharge); *Strickland v. Prime Care of Dothan*, 108 FSupp2d 1329,

1334-1335 (IV) (2) (M.D. Ala. 2000) (concluding that the defendant employer's

26

asserted grounds for termination of the plaintiff employee would be analyzed together, where the defendant "argues that [the plaintiff] was terminated for the totality of her conduct and not any one of the individual reasons (tardiness, rudeness, or failing to return from the doctor) considered separately").[8] Accordingly, the trial court erred in treating each alleged disciplinary infraction as a separate proffered reason that Wyatt had to rebut to survive summary judgment and in not considering Wyatt's evidence of pretext as a whole; instead, the court should have asked whether Wyatt came forward with evidence that in its totality "would present a basis for the disbelief of [MARTA's] overall justification." (Citation, punctuation, and emphasis omitted.) *Blockum v. Fieldale Farms Corp.*, 275 Ga. 798, 802 (4) (573 SE2d 36) (2002). See *Baptiste v. Mann*, 360 Ga. App. 345, 356 (3) (861 SE2d 212) (2021)

---

[8] See generally *Russell v. Acme-Evans Co.*, 51 F3d 64, 70 (7th Cir. 1995) ("There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined[ ] . . . that the plaintiff could withstand summary judgment."). Accord *Holland v. Gee*, 677 F3d 1047, 1060 (III) (A) (3) (a) (11th Cir. 2012) (concluding that because the jury could have found that the employer's first asserted reason for terminating the employee was pretextual, the jury could have found that employer's second asserted reason was "fishy and suspicious as well" because the two reasons were "closely related") (citations and punctuation omitted); *Woodard v. Fanboy, LLC*, 298 F3d 1261, 1267 & n. 10 (11th Cir. 2002) (concluding that evidence that one of the defendants' proffered non-discriminatory grounds was pretextual tainted the second proffered ground as well, where the two grounds were "closely intertwined" and the defendants "often bundled the two reasons together") (citation and punctuation omitted).

("[T]o determine whether a reasonable jury could find that the employer's stated explanation for the plaintiff's termination was a pretext for retaliation, the court must consider all the circumstances together[.]") (citation and punctuation omitted). See generally *Canady v. Cumberland Harbour Prop. Owners Assn.*, 340 Ga. App. 439, 442 (1) (797 SE2d 674) (2017) ("[I]n considering the grant of summary judgment, . . . the trial court must look at the entire record[.]") (citation and punctuation omitted). In other words, the fact that Wyatt could not prove the falsity of each and every alleged disciplinary infraction was not fatal to his GWA claim, if Wyatt otherwise could point to evidence that, when viewed in its totality and in the light most favorable to him, would support a finding by a reasonable jury that MARTA's overall justification for his termination – unsatisfactory performance – was false and pretextual. See id. See also *Busby v. City of Orlando*, 931 F2d 764, 781 (I) (C) (11th Cir. 1991) (concluding that if the plaintiff came forward with evidence that "any part of the disciplinary process was . . . motivated" by discrimination, she could establish pretext, given that the plaintiff allegedly was terminated by the defendant after a series of interrelated investigations "because her actions were part of a 'cumulative record' of violations which [were] described as 'intolerable'"); *Laxton*, 333 F3d at 580 (IV) (B) (concluding that a reasonable jury could find that the defendant's

justification for the plaintiff's discharge was pretextual, even though the plaintiff "concede[d] that certain violations of store policy took place," where the defendant did not discharge her solely for those violations, but rather for the "cumulative effect of many violations") (punctuation omitted); *Strickland*, 108 FSupp2d at 1334-1335 (IV) (1, 2) (finding a genuine issue of material fact on the question of pretext where the plaintiff was terminated "for the totality of her conduct and not any single type of conduct considered separately," even though the evidence showed that she committed one of the alleged workplace infractions).

On appeal, Wyatt argues that he established a genuine issue of material fact that MARTA's overall justification for his termination was false and pretextual because he presented evidence that Safety Department management knew that many of the infractions of which he was accused were false, and because he presented "an array of other evidence of pretext," including, he maintains, evidence that MARTA gave inconsistent explanations for his discipline and termination, increased the intensity of his supervision after he raised safety concerns, departed from its normal rules and procedures in how it handled his workplace complaints and his termination, and fired other SOOs who raised similar safety concerns. However, because the trial court erroneously treated Wyatt's alleged infractions as separate proffered reasons for

29

his termination that each had to be rebutted, the court did not consider the aforementioned arguments raised by Wyatt and did not address whether the totality of the evidence would support a finding of pretext. Consequently, given that the trial court did not apply the correct legal analysis and the record in this case is voluminous, we vacate the trial court's final order granting summary judgment to MARTA and remand for further action consistent with this opinion. See *City of Gainesville v. Dodd*, 275 Ga. 834, 838-839 (573 SE2d 369) (2002) (noting that in cases where the trial court relies on an erroneous legal theory in its summary judgment ruling, appellate courts have the discretion to vacate the trial court's order and remand for application of the proper legal analysis).

*Judgment vacated and case remanded with direction. Mercier, and Land, JJ., concur*.